UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

LORNA GERIS, Individually, and as
Personal Representative of the Estate of FRED GERIS,
and as Parent and Natural Guardian of Christopher,
Matthew, and Kristine Geris, and the WORKPLACE
SAFETY & INSURANCE BOARD
OF ONTARIO, as Subrogee,

      Plaintiffs,

v.              Civil Action No.: 1:07 CV 00376

DiSILVA TAUNTON EXPRESS INC. and
JOSE L. MARTE,

      Defendants.

---

## REPLY DECLARATION IN FURTHER SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS DISILVA TAUNTON EXPRESS, INC., AND JOSE L. MARTE

I, R. ANTHONY RUPP III, ESQ., do hereby declare as follows:

1.  I am an attorney duly licensed to practice law and a member of the law firm Rupp, Baase, Pfalzgraf, Cunningham & Coppola LLC. I am familiar with the prior pleadings and proceedings had heretofore and the facts and circumstances herein.

2.  I submit this declaration further in support of defendants' motion for summary judgment.

3.  The following additional exhibits are being submitted to the Court:

  **Exhibit "A"**  Brief of the defendant in the Appellate Division, Third Department case of *Harris v. Ballard*.

**Exhibit "B"**     DTE training videos (incorporated by reference and to be provided in hard copy to the Court).

4.     To begin, in view of plaintiffs' failure to concede they have no valid claim for punitive damages, a counterstatement of facts is necessary to give the Court an objective and balanced summary of the testimony, rather than the mischaracterizations, dramatizations, and out-of-context facts articulated by the plaintiffs.

## COUNTERSTATEMENT OF FACTS

*Testimony of Chris DiSilva from DiSilva Taunton Express – Depositon # 1*

5.     At his initial deposition from March 2008, Mr. DiSilva testified that he is the president of DTE and is responsible for managing its day-to-day business. The company is the successor to DiSilva Transportation, which was in operation from 1981 – 2005 when "we reformed the company in a new location." He described DTE as "a family business [where] we'll sit together and discuss our businesses in general and what we can do to improve different areas." (15-20, 22).

6.     DTE employs about 60 company drivers and 140-150 independent-contractor drivers. (41). Mr. Marte was an independent contractor who worked for owners/operators Lilia Silva and Amilcar Silva. (11-12). When hiring independent-contractor drivers, the company followed the recommended hiring process from the Department of Transportation. (42). When asked about the comparative costs to DTE of using company drivers versus independent contractors, Mr. DiSilva testified that the costs are "pretty close to equal." (46).

7.  After Mr. Marte applied, DTE investigated his driving record and performed a background check. He had no traffic violations, accidents, or suspensions. (64, 81).

8.  On January 9, 2006 – which was before Mr. Marte was hired – DTE gave him a road test where he was evaluated by DTE operations manager Peter Cambra. (66-70).

9.  Before driving on public roads, new drivers such as Mr. Marte were required to complete a driver qualifications checklist, watch training videos in a classroom setting, attend question-and-answer sessions, and learn about company policies regarding accidents. (51, 77-78, 99-100, 118, 120). Drivers also were given "a lot of handouts and manuals," including a driver handbook. This was standard practice for both company drivers and independent contractors. (101, 112).

10.  Before Mr. Marte was allowed to drive on his own, he accompanied another driver on at least 2-3 trips to receive further training on topics like upshifting and downshifting, among others. (68-69).

11.  DTE also had a 90-day probationary period for new drivers where they were monitored by management to make certain that they were both mentally and physically capable of performing all aspects of the job. (124-125).

12.  With respect to DTE's safety policies, the company employed several people to handle safety. (17). One employee was Brian Libby, who trained drivers and offered safety advice "based on information he receives from various state police agencies, the Department of Transportation and other transportation-related organizations within the United States . . . On occasion, he will come to Taunton and he teaches corporately. At some of our locations he teaches a defensive driving course, which we teach at Taunton as well. We teach his course in

operation. Our operation has become too large for him to handle, so we hired a gentleman [named Ken Cummings] who does our defensive driving training based on Brian's course." (36-37).

13. Mr. Libby continued to train DTE drivers on specific safety issues. Most recently before the accident, in January/February 2006 he conducted initial driver training, hours of service training, and equipment operation training. (36-38, 75, 77).

### *Testimony of Chris DiSilva from DiSilva Taunton Express – Deposition # 2*

14. At Mr. DiSilva's second deposition, he testified that before drivers were allowed to operate tractor trailers for DTE they underwent several types of training, observation, and evaluation with the company. For example, drivers were required to attend safety classes and watch the following nine videos (11-12, 25-29):

- Seven Minute Solutions – Driving Techniques.
- Penske Precision – Training for Entry Level Drivers.
- Seven Minute Solutions – Accident Procedures.
- Seven Minute Solutions – Emergency Maneuvers.
- Seven Minute Solutions – Driver Fatigue.
- Seven Minute Solutions – Speed and Space Management.
- Roadside Inspections.
- Out of Service.
- Experience Speaking, Adverse Weather.

15. Prospective drivers also were required to take a pre-employment road test that involved highway driving. Even though there was some debate in the company as to the precise definition of "highway driving" in that some did not consider it to be a true highway test because significant highway driving was not involved, the prospective drivers drove on the highway nevertheless. (128).

16. After the DTE road test, drivers had additional training. The company had 3-4 drivers responsible for driver and safety training. (48, 53).

17. Every driver who worked for DTE – employee and independent contractor – drove with a trainer an average of three times before being allowed to drive on his own. (47).

18. DTE used a daily progress log to track a driver-trainee's progress in categories including: lane use, lane change, speed management, space management, hazard perception, and risk management. The progress log was used for both employees and independent contractors. (42-44).

19. After the trained driver was permitted to drive on his own, he was subject to DTE's probationary policy. If the driver was involved in a preventable accident during his first 90 days, he was subject to termination or suspension. (34-35). One such driver was Joao Silva. He was hired to drive for DTE on 3/16/05 and was involved in an accident on 5/9/05. The accident was deemed preventable and Silva was suspended by DiSilva Taunton for one week. Another DTE driver, Robert Bautista, was disciplined as well. (96). DTE thus enforced its disciplinary policy.

### *Testimony of Peter Cambra of DiSilva Taunton Express*

20. At the time of his April 2008 deposition, Mr. Cambra was the operations manager for DTE where he was responsible for road testing new drivers, training drivers, customer service, logistics, accidents, and the handling of accident claims. (25-26, 41, 56, 94, 126-129). At the time, DTE employed approximately 285 truck drivers. (30). Amilcar Silva was an owner/operator who independently had contracted with the company for many years. (38-39).

21. With respect to Mr. Cambra's background, he obtained his tractor-trailer license in the early 1980's. (11-12, 21-22). He worked for American Frozen Foods from 1979-1996, where he eventually became the company's operations supervisor and safety director. (16, 22-24). In the latter position he was responsible for driver qualifications, vehicle condition reports, logs, proper maintenance, and compliance with rules set by the Department of Transportation. (24). Throughout his career, he took safety and driving courses with the Motor Truck Association, JJ Keller, Liberty Mutual, the American Truck Association, the University of Delaware, and Penn State University. (10, 12-14, 19-20). The Penn State course specifically involved training about "what is required by the Federal government in qualifying a driver." (15-16).

22. At DTE, one of Mr. Cambra's responsibilities involved the training of drivers and supervisors. He instructed drivers about defensive driving, how to keep an accurate logbook, reasonable suspicion drug testing, and how to operate a refrigerated trailer. (42, 49-50, 53). With respect to logbook training, he trained both new and old drivers, and part of the training involved a video produced by the JJ Keller company instructing drivers about the 16 required

items that a log must contain. (42-43, 47). Training sessions included both DTE employees and independent contractors. (48-49).

23. Mr. Cambra was also involved in road testing job applicants. The road test was given to both independent contractors and DTE employees. In Mr. Cambra's words, "I would give them a road test prior. If they passed, if they had a medical certificate that said that they were qualified and they passed the drug and alcohol test. If they didn't pass either one of them, they wouldn't even get to me." (50-52, 57, 60, 128-129).

24. Road testing was not required by the DOT. The company started the practice company-wide after Chris DiSilva started working for DTE. (69-70, 78).

25. Mr. Cambra gave Mr. Marte his road test on January 9, 2006. (57, 63-64). For road tests, the prospective DTE driver operated a tractor with a trailer attached, just like he would on the road. (65-66).

26. Around the time of Mr. Marte's road test, Mr. Cambra's practice was to ensure that the file of the prospective driver contained all required qualifications. This included his DOT card, a copy of the long-form physical, drug test results, and the driver's Social Security card, medical card, and driver's license. (81-84).

27. Mr. Cambra described the road test procedure generally as follows: "You instruct the driver to start basically with # 1, which is the pre-trip. Once he hooks up the vehicle he would turn on his lights, crank up his landing gear, hook up his air hoses, do a circle to make sure – this is part of the orientation – going back to that where he would look at his wheels, make sure there is nothing leaking. His four-ways are flashing, all the lights were working, check the safety equipment on his tractor, which he should have done before he got here, but we want to

make sure he goes through that procedure. And then the starting and stopping. How does he react when he comes to a stop sign? Does he drag his clutch? Does he use his clutch? And the A's, B's, and C's down below explain the scores for doing different duties." (66-67).

28. As far as Mr. Marte's road test was concerned, he got an A on his pre-trip inspection. His starting, stopping, and lane usage were performed in a safe manner. He got a C in upshifting and downshifting, which meant that Mr. Marte "doesn't know the particular [shifting] pattern of the vehicle that he was driving." (67-69).

29. During the initial DTE road test, Mr. Marte performed no highway driving. When asked as to why, Mr. Cambra explained that "it would basically be a one exit. To me, that is not highway driving." (73). Instead of doing a longer highway test during the new driver evaluation, Mr. Cambra had Mr. Marte and other drivers "follow Route 140 all the way down to the traffic light where there is a college and a residential area where you make a right-hand turn, and in a congested college area, go through blinking yellow lights, go by a fire station, and then you catch a ramp and drive one exit on the highway and come off and go back into the park and park the truck." (74).

30. After Mr. Marte completed his road test, Mr. Cambra thought he was properly trained to drive a tractor trailer. When asked as to why, Cambra testified that "He wouldn't have had his license otherwise . . . If you don't qualify to get a license, you don't get it. If you get a license that means you should be qualified." (110).

31. After the driver passed the road test, all new drivers – both DTE employees and independent contractors – were required to attend an orientation program and embark on a training period. During this program, new drivers were given handouts and other materials, and

each was instructed about what the job required. The training was performed either by a DTE employee or by the individual owner/operator. At the end of training sessions, drivers were given a 10-15 item questionnaire to complete. Drivers were also "constantly trained verbally" during their time at DTE. (43, 45, 55, 60-62, 78, 80, 85, 91, 114-116).

32. After the road test and orientation, DTE required that the new employee accompany a more-experienced driver on several trips as part of the training process. Sufficient trips were taken until it was determined that the driver could perform the job on his own. (120-121). If the driver was an official DTE employee, an experienced DTE driver would drive with him. If the driver was an independent contractor, he would likely drive with his owner/operator. Plaintiffs' counsel deemed this practice a "double standard." (124-126). In explaining that characterization, Mr. Cambra testified that "The difference is that the owner/operator is the driver-trainer for his own people. He knows the requirements of the job. Once he could fulfill the qualifications of the job, [and] he felt comfortable that he could go out on is own, he would. It is in reference to a driver-trainer or a company. Once he felt that he could do the job and knew what the requirements were, he was on his own." (121-122).

33. Mr. Cambra testified that part of Brian Libby's responsibilities was to "get everybody trained. Even if he didn't know them and he had never seen them physically, he was going to stay there and do it . . . He was instructed to come down and assist Melissa [Gibson] and get everybody up to date." (87-88).

34. Mr. Cambra admitted that the company "had some issues as far as with the DOT and everything and we had to get the people squared away and we weren't doing a few things

- 9 -

properly." (87). There were also some issues with the quality of Ms. Gibson's work as safety director involving a failed DOT audit, a rating issue, and her record keeping. (130-131).

35. Mr. Cambra was informed about the accident the day it happened. "The only thing I did with the accident was to handle the cargo aspect of it. As far as anything else, I wasn't privy to it." (91-92). He did learn, however, that after the accident Ms. Gibson made arrangements with the towing company to have the cargo transferred to another trailer. Mr. Cambra then arranged to have it transported back to DTE, where it was tested to be redelivered. (93-94).

36. One subject of inquiry with Mr. Cambra was the Motor Carrier Management Information System (MCMIS), which he described as an organization that keeps track of a company's accidents based on police reports. In cautioning reliance on the MCMIS, Mr. Cambra testified that "What we have to understand about the Motor Carrier Management Information System is that if you are a participant in the accident, [it] doesn't mean if you're right or wrong. You are recorded. You could totally be a bystander, but if you are involved in any way, liable or not, you're recorded because you're a participant . . . It just shows that you were involved" (94-96, 100).

### *Testimony of DTE Employee Brian Libby*

37. Mr. Libby first became connected to DTE in September/October 2005 when he was asked to review company files and perform a mock audit. (45-46). He thereafter assisted with a 2006 audit performed by the DOT where he determined that "there were not certifications of the training that was done previously." As a consequence, all drivers were retrained to ensure

that the company was in DOT compliance and to make certain there was proper documentation for each driver. ( 28, 31-32, 67-68).

38. Mr. Libby's current role at DTE is to prepare safety training advisories and help train DTE drivers. (27-28). His first safety training advisory was published in November 2005. His practice is to publish an advisory every two weeks. (60).

39. Libby became involved in driver training at some point after the February 22, 2006 accident involving Mr. Geris. (45, 48-49). Part of that training involved safety videos from the company JJ Keller, quizzes, and instruction consistent with the Safestat scoring system. (50-51, 70, 90-91). If the employee was an independent contractor, Mr. Libby trained the owner/operator himself, and the owner/operator became responsible for training his own driver. (102-103). Defensive driver courses were taught to drivers and DTE trainers. (102).

40. Before a person started to drive for DTE, the company would give each a road test, which they were required to pass. Although this practice was not required by the DOT, it was required by DTE as a pre-condition to employment. (110, 112).

41. Much time was spent with Mr. Libby discussing S.E.A scores. (93-94). Over time, and after an initial period of decline, the S.E.A. scores for drivers improved (85-86):

- 12/2/05 – 82.98.
- 12/23/05 – 79.23.
- 1/27/06 – 77.71.
- 2/24/06 – 76.55.
- 3/31/06 – 96.28.

42. After December 2005, the S.E.A. scores improved for vehicles as well (87-89):

- 12/23/05 – 60.55.
- 1/27/06 – 81.55.
- 2/24/06 – 80.25

43. The fact that DTE's scores improved reflected a concern for and interest in driver and vehicle safety.

### *Testimony of DTE Employee Melissa Gibson*

44. DTE had an established procedure about how to evaluate applications from prospective drivers. On that subject, Ms. Gibson testified that (34, 38-39, 43-44, 204, 221-229):

- The prospective driver would complete an application, which she reviewed to determine whether the proper documentation was provided.

- A qualifications checklist was utilized to screen drivers to ensure they were qualified. Only if all items were satisfactory would the prospective driver be permitted road test. In fact, it was specifically Mr. Cambra's policy that a person could not take the road test unless his application file contained all the proper documents.

- The prospective driver's prior employment would be verified.

- A drug test would be performed.

- The prospective driver's motor vehicle record (MVR) would be obtained.

- If it was determined that a prospective driver (including an owner/operator) required additional training, they were told to undergo additional training and return for another road test only when ready. (40).

45. The above procedures were followed with Mr. Marte. After investigating his driving record, Ms. Gibson did not recall him having any prior accidents. (102-103, 205). In fact, while working for DTE he had no other accidents. (124-125). Although he was eventually

terminated in accordance with the company's preventative accident policy, Ms. Gibson was not aware of any complaints about Marte from when he started in January 2006 to the February 22, 2006 accident. (68, 239-240).

46. DTE also had a practice of performing its own audit procedures, which Ms. Gibson described as follows:

- An internal audit was performed in November 2005 of driver Q-Files, (the files of job applicants) to ensure that all required documents were received. (102-103, 119).

- Occasionally, Ms. Gibson's files were sent to another terminal to conduct a mock audit prior to an actual DOT audit. (84).

- An internal mock audit was performed in late 2005 or early 2006 by Mr. Libby. (95-96).

47. Both with and without company audits, Ms. Gibson provided details about DTE's driver training program:

- The company responded responsibly to DOT audits by performing additional training where deficiencies were identified. (77-78). For instance, when audits revealed weak spots, DTE brought in multiple trainers from other facilities to address those deficiencies. (31, 35, 55). The training included videos and testing. Ms. Gibson did not conduct any of the training. (35-36). Mr. Libby provided training on safety, logbooks, and driver fatigue, to name a few. (91). He was hired before and after the 2005 DOT audit to perform training. (199).

- Logbook training was also provided by a gentleman from Penske and other drivers and Fleet Safety managers from other facilities. (55, 91, 99-100).

- Safety reminder memos were put in driver's paychecks on the subjects of driver fatigue and winter driving in snow and ice, among other topics. These were called "payroll stuffers." (36-37).

- Ms. Gibson herself underwent training for driver fatigue and log-book compliance. (42).

### *Testimony of Defendant Jose Marte*

48.  Mr. Marte was born on 1/22/82. He received his driver's license when 18 years old and had six years of driving experience when the accident happened. (6-7, 40-41). During his career, he worked for a number of trucking and transportation companies, including DTE, Western Trucking, Quality Beef, and New Deal Transportation. (7-15, 39). He did not have any criminal convictions or previous lawsuits. (16-17). He worked for DTE from December 2005 to shortly after the February 22, 2006 accident. (13-15).

49.  Mr. Marte attended the New England Tractor Trailer School in Rhode Island from mid-2005 to December 2005. The program was five-months long, and consisted of 2 ½ months of classroom training and 2 ½ months of driving a tractor trailer. The total amount of class-time was 400-500 hours. He passed all tests, completed the program, and graduated. (30-36). His co-driver at the time of the accident, Noel Columna, attended the school with him. (98-99).

50.  Mr. Marte obtained his class A CDL license in December 2005. This license allowed him to drive tractor trailers. (41-45).

51.  Mr. Marte applied to work for DTE on 1/6/06. (72-73). Before being hired he was sent for a drug urine test, which was negative. He was not sent for a physical because he had one in tractor trailer school. (50-51, 75-76). This prior physical was performed on 8/6/05, and it was determined that he "meets standards" under the CFR. *See* **Exhibit "Q"** to defendants' original motion.

52.  When Mr. Marte started with DTE, he took and passed the required road test. (53-54). Peter Cambra administered the test and graded him. (65, 67). The grades given were

mostly B's, two's C's (for up shifting and downshifting), and 3 A's. *See* **Exhibit "Q"** to defendants' original motion.

53.     Mr. Marte received further training through the training manual, watching safety videos, and driving during certain weather conditions. (55, 86-88, 93). He also took quizzes about safety and driving generally. (81-83). After he started with DTE, he was paired with a driver who had more experience than he where they took three different trips together as part of the training process. Only after that training would DTE "send you on your own." (54-64, 95-96).

### *Testimony of Co-Driver Noel Columna*

54.     Mr. Columna was born on 7/1/63 and was 42 years old when the accident happened. (8). Before working for DiSilva Taunton, he went to New England Tractor Trailer Training School, where he had 480 hours of training. He thereafter obtained his commercial driver's license and started working for DTE as a truck driver in early 2006. (22, 24-25, 36-38).

55.     At DiSilva, Mr. Columna underwent additional trailing, including trailer refrigeration procedure, parking tractor trailers, and driving tractor trailers. The driving portion of the training was 3-4 hours which was in additional to the training at the New England Tractor Trailer Training School. (31, 35-40). His driving was also graded by Mr. Cambra of DiSilva Taunton. (42-43).

## SUMMARY OF RESPONDING ARGUMENT

56.     In further support of defendants' motion for summary judgment, we argue the following:

- Point I – The plaintiffs have misapplied the choice of law analysis on the issue of whether New York law prevents the WSIB from subrogating against the defendants.

- Point II – The Geris's assignment to the WSIB is void for champerty and must be dismissed.

- Point III – The WSIB's damages are limited to what it actually paid.

- Point IV – New York law applies to bar the claims for loss of consortium.

- Point V – Ms. Geris waived her rights and the rights of her children to bring or otherwise participate in a third-party action against the defendants.

- Point VI – Plaintiffs' claim for punitive damages must be dismissed.

## CONCLUSION

57.     By reason of the foregoing, the plaintiffs' action should be dismissed in its entirety. In the alternative, the WSIB's damages should be limited to what it paid to the Geris family; the Gerises' claims for loss of consortium should be dismissed; all claims that Ms. Geris brought individually, as the estate representative, and as the parent and natural guardian of her children should be dismissed; and the punitive-damages claims should be dismissed on the merits.

***WHEREFORE***, defendants DiSILVA TAUNTON EXPRESS INC. and JOSE MARTE respectfully request the following relief:

(A) That plaintiffs' action be dismissed in its entirety; or

(B) In the alternative, that the WSIB's damages be limited to what it paid to the Geris family; that the Gerises' claims for loss of consortium be dismissed; that the claims that Ms. Geris brought individually, as the estate representative, and as the parent and natural guardian of her children be dismissed; and that the punitive-damages claims be dismissed; and

(C) For such other, further or different relief that the Court deems just and proper.

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on April 22, 2013, at Buffalo, New York.

By:   s/ R. Anthony Rupp III
      R. Anthony Rupp III, Esq.