UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

LORNA GERIS, Individually, and as
Personal Representative of the Estate of FRED GERIS,
and as Parent and Natural Guardian of
CHRISTOPHER, MATTHEW, and KRISTINE GERIS;
and, THE WORKPLACE SAFETY &
INSURANCE BOARD OF ONTARIO,
as Subrogee,

                                        Plaintiffs,

                    -vs-                                        07-CV-376-JTC

DiSILVA TAUNTON EXPRESS, INC., and
JOSE L. MARTE,

                                        Defendants.

_____

        In this action, originally filed in New York State Supreme Court, Erie County, and

removed to this court pursuant to 28 U.S.C. §§ 1446 and 1332 on the basis of complete

diversity of the citizenship of the parties, plaintiffs seek damages for wrongful death arising

out of a motor vehicle accident which occurred on the New York State Thruway on

February 22, 2006, resulting in the death of plaintiffs' decedent, Fred Geris.

        Defendants have moved for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure, seeking dismissal of the entire action or, alternatively, certain

claims (Item 67), and plaintiffs have filed a cross-motion for partial summary judgment on

liability (Item 72).  For the reasons that follow, defendants' motion and plaintiff's cross-

motion are both denied.

## BACKGROUND

The following factual and procedural background is derived from the pleadings, affidavits, declarations, exhibits, discovery materials, and other submissions on file (including the parties' respective Statements of Facts on Motion for Summary Judgment pursuant to Rule 56(a) of the Local Rules of Civil Procedure for the Western District of New York (Items 67-24 and 72-2)).

## I.    The Parties

### A.    The Plaintiffs:  Lorna Geris and the WSIB

Plaintiff Lorna Geris brings this action on her own behalf and on behalf of her minor children as representative of the estate of her husband, Fred Geris.  Ms. Geris was born on January 10, 1970, and grew up in the Philippines.  In the early 1990's, soon after she immigrated to Canada, she met Fred Geris while they were working at the same hotel bar in Toronto.   They later married, and at the time of the events at issue here, they lived in Etobicoke, Ontario (a Toronto suburb) with their three minor children–Christopher (then age 11), Matthew (then age 9), and Kristine (then age 6).  *See* Item 72-2, ¶¶ 2, 1-13.

Fred Geris was born on December 25, 1953, in London, Ontario.  Following his retirement from a 25-year career in active duty and civilian service for the Canadian Armed Forces, Mr. Geris obtained his Commercial Driver's License ("CDL") in 1995 upon completion of a commercial driver training program at Humber College's Transportation Training Centre.  He worked for Schneider's Trucking Company for several years, and then for two other small trucking companies, before he was hired by Brian Kurtz Trucking, Ltd. ("Kurtz Trucking") in December 2004.  *See* Item 72-2, ¶¶ 2-10.

The Workplace Safety and Insurance Board of Ontario, Canada ("WSIB"), is also a plaintiff in this action.  The WSIB was created under Ontario law to operate as the insurance carrier and administrative body for processing worker's compensation claims by or against Ontario domiciliaries, pursuant to the authority of the Workplace Safety and Insurance Act ("WSIA"), S.O. 1997, C.16 (Can.).  The WSIB brings this action against defendants DTE and Mr. Marte as "subrogee," having paid workers' compensation benefits to Ms. Geris in accordance with her election of remedies under the WSIA (as explained at further length below).

### B.    The Defendants:  Jose Marte and DiSilva Taunton Express

Defendant Jose Marte was born on January 22, 1982, in the Dominican Republic. He moved to the United States in 1995, and currently resides in Providence, Rhode Island. He was 23 years old when he received his CDL in December 2005, following completion of a five-month training course at New England Tractor-Trailer School ("NETTS").  Soon thereafter, in January 2006, he went to work as a truck driver for defendant DiSilva Taunton Express, Inc. ("DTE").  *See* Item 67-19, pp. 27-30; Item 67-21, pp. 1-17.

DTE was one of a series of companies operated by Christopher DiSilva and his family.  DTE was established in 2005, and operated from its principal business location in Taunton, Massachusetts transporting groceries and foodstuffs for retailers.  DTE is no longer in business, having ceased operations in February 2010.  While it was in operation, DTE  was staffed by a combination of its own employees and drivers employed by independent vehicle owners who contracted with DTE to provide vehicles and services necessary to fulfill customer requirements.  One such independent contractor was the

husband and wife team of Lillian and Amilcar Silva (not related to the DiSilva family), who owned the vehicle involved in the accident giving rise to this action, and hired defendant Marte as a driver.  *See* Item 72-2, ¶¶ 42-47.

## II.    The Accident

On the morning of February 22, 2006, Mr. Geris was traveling eastbound on the New York State Thruway (Interstate I-90), hauling a load of marine batteries for Kurtz Trucking in a 2003 Kenworth tractor-trailer.  At the same time, Mr. Marte and his co-driver, Noel Columna, were traveling eastbound on the Thruway on their way back from Chicago, Illinois to DTE's facility in Taunton, Massachusetts, hauling a load of refrigerated eggs in a 2001 Freightliner tractor-trailer.  Mr. Marte and Mr. Columna had stopped at the Angola service area, and had parked their tractor-trailer on the right shoulder of the deceleration (exit) ramp leading to the service area.

At approximately 7:55 a.m., as Mr. Geris's vehicle approached the Angola service area, Mr. Marte attempted to re-enter traffic by driving his vehicle across the deceleration ramp and into the right driving lane, directly in front of Mr. Geris.  The passenger side of Mr. Geris's cab struck the rear driver's side of Mr. Marte's trailer, causing Mr. Geris' vehicle to travel onto the left shoulder, then back across both lanes, coming to rest against an embankment in a ditch on the right shoulder of the Thruway.  At some point after impact, Mr. Geris–who was not wearing a seatbelt–was ejected from the cab.  He did not survive the accident.  Mr. Marte and Mr. Columna were not injured.   *See* Item 67-24, ¶¶ 1-5; Item 72-2, ¶¶ 17-28.

-4-

On May 5, 2006, Investigator Kenneth Dubrinski and Trooper Glenn Walsh submitted a report to the New York State Police Troop "A" Collision Reconstruction Unit, containing the following reconstruction of the accident based upon an examination of the evidence and review of statements given relative to the case:

> On February 22nd, at approximately 7:55 A.M., Vehicle 1, a tractor/semi-trailer combination vehicle operated by **Jose L. Marte** was stopped on the paved South shoulder of the New York State Thruway at the exit ramp for the Angola rest area. The operator of Vehicle 1 attempted to re-enter the eastbound lanes of travel by driving across the exit ramp and through the neutral area.
>
> Vehicle 2, a tractor/semi-trailer combination vehicle operated by **Fred Geris** was traveling eastbound in the driving lane. The operator of Vehicle 2 observes Vehicle 1 enter his path traveling at a much slower speed. The operator of Vehicle 2 swerves to the left and applies the brakes in an attempt to avoid a collision.
>
> The passenger side of Vehicle 2's cab impacted the driver side rear of Vehicle 1's semi-trailer. Vehicle 1 was driven forward and to the right as a result of the collision. Vehicle 1 left the short dual skid marks noted in the driving lane as a result of the crash. As Vehicle 1 pulled forward to a controlled final rest on the South shoulder it also left a single skid mark.
>
> As a result of the collision, Vehicle 2's tractor unit began to rotate in a clockwise direction. Vehicle 2 swerved off the North shoulder before veering back onto the roadway. The unrestrained operator of Vehicle 2 was ejected out the passenger side of the cab, which was torn open at impact. The operator of Vehicle 2 was dragged across the driving lane and South shoulder before being released as the vehicle drove into the ditch off the South shoulder. As Vehicle 2's tractor traveled down into the ditch and was forced partially up the opposite bank, the forces involved caused the frame of the semi-trailer to break at the midpoint. The two halves of the trailer collapsed to the ground pinning the operator underneath.

Item 72-9, p. 7. The Reconstruction Report contained the following conclusion:

> The primary causes of this collision are the actions of Vehicle 1's operator, **Jose L. Marte**. Failing to yield to traffic already on the highway before entering from a stopped position on the South shoulder is the primary cause in this case. Entering the highway in this manner was made worse by the large disparity in speed between Vehicle 1 and the other traffic on the highway that was traveling at or near the speed limit of 65 miles per hour.

The proper course of action would have been to pull onto the entrance ramp, proceed through the rest area and use the acceleration lane coming out of the rest area so that he could merge with traffic at speed.

The fact that this collision resulted in a fatality was the result of Vehicle 2's operator, **Fred Geris**' failure to wear a seatbelt. The mechanics of this crash are such that there was not a sufficient change in velocity that would have been experienced by Vehicle 2's operator to result in a fatality had he been secured in his seat.

*Id.*

Mr. Marte was ticketed at the scene of the accident for failing to yield the right of way, in violation of N.Y. Vehicle & Traffic Law § 1143, and for vehicle log book and equipment violations, and was convicted on a plea of guilty to those charges. *See* Item 72-2, ¶¶ 39-40.

## III.   "Election" Under the WSIA

The WSIA provides injured workers (and their surviving spouses and children) statutory entitlement to financial compensation, medical treatment, re-employment assistance, and help re-entering the labor market on a no-fault basis. With respect to the issues in this case, the WSIA allows a surviving spouse to choose between: (a) accepting workers' compensation benefits under the Act; or (b) maintaining a third-party action for damages. The controlling authority is Section 30 of the WSIA, which provides in relevant part as follows:

### WSIA Section 30 – Election

Election, Current Entitlements

(1)    This section applies when a worker or a survivor of a deceased worker is entitled to benefits under the insurance plan with respect to an injury or disease, and is also entitled to

                commence an action against a person in respect of the injury or disease.

(2)      The worker or survivor shall elect whether to claim the benefits or to commence the action and shall notify the Board of the option elected.

## Election, minor

(7)      If the worker or survivor is less than 18 years of age, his or her parent or guardian or the Children's Lawyer may make the election on his or her behalf.

## Subrogation, Schedule 1 employer

(10)    If the worker or survivor elects to claim benefits under the insurance plan and if the worker is employed by a Schedule 1 employer or the deceased worker was so employed, the Board is subrogated to the rights of the worker or survivor in respect of the action.   The Board is solely entitled to determine whether or not to commence, continue or abandon the action and whether to settle it and on what terms.

## Surplus

(12)    If the Board or the employer pursues the action and receives an amount of money greater than the amount expended in pursuing the action and providing the benefits under the insurance plan to the worker or the survivor, the Board or the employer (as the case may be) shall pay the surplus to the worker or survivor.

## Effect of surplus

(13)    Future payments to the worker or survivor under the insurance plan shall be reduced to the extent of the surplus paid to him or her.

## If worker elects to commence action

(14)    The following rules apply if the worker or survivor elects to commence the action instead of claiming benefits under the insurance plan:

1.   The worker or survivor is entitled to receive benefits under the insurance plan to the extent that, in a judgment in the action, the worker or survivor is awarded less than the amount described in paragraph 3.

2.   If the worker or survivor settles the action and the Board approves the settlement before it is made, the worker or survivor is entitled to receive benefits under the insurance plan to the extent that the amount of the settlement is less than the amount described in paragraph 3.

3.   For the purposes of paragraphs 1 and 2, the amount is the cost to the Board of the benefits that would have been provided under the plan to the worker or survivor, if the worker or survivor had elected to claim benefits under the plan instead of commencing the action.

WSIA § 10, S.O. 1997, C.16 (Can.)

WSIA Section 20 describes what occurs when a person or surviving spouse may be entitled to damages under the laws of another jurisdiction (such as New York State):

(1)   This section applies if a worker is entitled to benefits under the insurance plan relating to an accident and is also entitled to compensation under the laws of another jurisdiction in respect of the accident regardless of where the accident occurs.  This section also applies with necessary modifications if the worker's survivors are so entitled.

(2)   The worker shall elect whether to receive benefits under the insurance plan, or to receive compensation under the laws of the other jurisdiction and shall notify the Board of the option elected.

WSIA § 20.

On May 15, 2006, Ms. Geris signed an "Election Form" indicating her choice as Mr. Geris' surviving spouse to accept benefits pursuant to the WSIA.  The form states in relevant part as follows:

3.      As a spouse or dependent under the Workplace Safety and Insurance Act, I may be able to claim benefits under the Insurance plan OR I may be able to bring a legal action against a person or persons who may have been responsible for my accident.

…

6.      I choose to receive benefits under the WSIB plan.

7.      I understand that this means that the Workplace Safety and Insurance Board may bring a legal action.  I understand that I cannot bring a legal action against anybody on my own.

Item 67-12, p. 2.


## V.      The Action

On May 2, 2007, plaintiffs filed suit in New York State Supreme Court, Erie County, against defendants DTE and Marte asserting causes of action for wrongful death, conscious suffering, compensatory damages, and punitive damages.  Item 1, pp. 8-15. The action was removed to this court by Notice of Removal dated June 13, 2007, and proceed through resolution of discovery disputes, several extensions of the deadline for fact discovery, unsuccessful mediation attempts, and amendment of the pleadings to add claims on behalf of Ms. Geris and her children for compensatory damages based on loss of "love, society, companionship, advice, care, guidance and support" (*see* Amended Complaint, Item 54, ¶¶ 42, 46).

On December 17, 2013, defendants filed a motion for summary judgment seeking dismissal of the action in its entirety or, in the alternative, dismissal of certain claims.  In support of the motion, defendants submitted (with leave of the court) a lengthy memorandum of law (Item 67-23) raising several doctrinal legal arguments, which the court has distilled to the following grounds:

A.   New York law (which, under "conflict of law" analysis, governs all substantive legal issues in this action) does not recognize the right of a workers' compensation insurer (like the WSIB) to bring a third-party subrogation claim against potential tortfeasors (like defendants Marte and DTE).

B.   Ms. Geris's assignment of her wrongful death claim to WSIB is invalid under New York's champerty statutes.

C.   Even if WSIB is permitted to maintain this action, its recovery in subrogation is limited under New York law to damages in the amount it has paid to the injured party.

D.   New York does not recognize a claim for non-pecuniary injury, such as loss of consortium.

E.   Ms. Geris's election to receive WSIA benefits on behalf of herself and her three children resulted in an absolute waiver of their rights to bring a third-party action against any potential tortfeasor.

F.   Plaintiffs' punitive damages claim should be dismissed as a matter of law.

*See* Item 67-23.

Plaintiffs have responded to the motion, and have filed a cross-motion for partial summary judgment on liability, based on the undisputed evidence of Mr. Marte's negligence as a matter of law–in particular, his plea of guilty to the charge that he failed to yield the right of way in violation of N.Y. Vehicle & Traffic Law § 1143.

## DISCUSSION

I.   **Summary Judgment**

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the language of this Rule has been amended in recent years, the well-settled standards for considering a motion for summary judgment remain unchanged. *See, e.g., Faulkner v. Arista Records LLC*, 797

F. Supp. 2d 299, 311 n. 7 (S.D.N.Y. 2011); Fed. R. Civ. P. 56, Committee's notes to 2010 amendments.   Under those standards, the moving party bears the initial  burden of establishing that no genuine issue of material fact exists.  *Rockland Exposition, Inc. v. Great American Assur. Co.*, 746 F. Supp. 2d 528, 532 (S.D.N.Y. 2010), *aff'd*, 445 F. App'x 387 (2d Cir. 2011).  A "genuine issue" exists "if the evidence is such that."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law …."  *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial is needed …."  *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotation marks and citation omitted), *quoted in Kaminski v. Anderson*, 792 F. Supp. 2d 657, 662 (W.D.N.Y. 2011).   In considering whether these respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks and citation omitted).

II.     **Defendants' Motion**

A.     **Conflict/Choice of Law**

The essence of defendants' argument in support of its summary judgment motion is that a fundamental conflict of law exists in this case between the law of Ontario, which recognizes the right of the workers' compensation insurance carrier–*i.e.*, the WSIB–to bring a third-party subrogation action against a potential tortfeasor for reimbursement of amounts paid to an injured worker or survivor as workers' compensation benefits, and the law of New York, which does not recognize such a right.  According to defendants, under New York's choice-of-law rules, the law of the place where the tort occurred–New York–should apply across the board to the substantive legal issues in the case, requiring dismissal of the action.

It is well established that a federal district court siting in diversity must generally apply the law of the state in which its sits, including that state's choice of law rules.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012).  By way of background, and as explained by defendants in their supporting memorandum, New York's choice of law rules have evolved over the years. The traditional approach to choice of law problems arising in tort was simply to apply *lex loci delicti*, the law of the place of the tort, to all substantive issues in the case.  *See Cooney v. Osgood Mach.*, 81 N.Y.2d 66, 71-72 (1993) (citing *Poplar v. Bourjois*, 298 N.Y. 62, 66 (1948)).  This approach eventually gave way to a more flexible interest-based analysis, "giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Babcock v. Jackson*, 12 N.Y.2d 473, 481 (1963); *see*

-12-

*In re Air Crash Near Clarence Center, New York, on February 12, 2009*, 882 F. Supp. 2d 405, 409-10 (W.D.N.Y. 2012).

Recognizing the difficulties encountered by courts undertaking an "interest analysis," and the inconsistent decisions which had resulted, the Court of Appeals sought to provide "a greater degree of predictability and uniformity" by proposing three principles "as sound for situations involving guest statutes in conflicts settings." *Neumeier v. Kuehner*, 31 N.Y.2d 121, 127, 128 (1972). Later, in *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189 (1985), the court confirmed its application of *Babcock*'s interest analysis approach, and the rules developed in *Neumeier*, to choice of law issues presented in cases other than those involving conflicting guest statutes. *Id.* at 199. In doing so, the court explained:

> [T]he relative interests of the domicile and locus jurisdictions in having their laws apply will depend on the particular tort issue in conflict in the case. Thus, when the conflicting rules involve the appropriate standards of conduct, … the law of the place of the tort "will usually have a predominant, if not exclusive, concern" because the locus jurisdiction's interests in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future assume critical importance and outweigh any interests of the common-domicile jurisdiction. Conversely, when the jurisdictions' conflicting rules relate to allocating losses that result from admittedly tortious conduct, … [a]nalysis then favors the jurisdiction of common domicile because of its interest in enforcing the decisions of both parties to accept both the benefits and the burdens of identifying with that jurisdiction and to submit themselves to its authority

*Schultz*, 65 N.Y.2d at 198 (citations omitted).

However, when the conflict at issue involves workers' compensation law, federal courts sitting in diversity have found New York's choice of law rule to be much clearer: "It is the law of this state that the rights of an employer and its insurance carrier to be reimbursed for workers' compensation benefits paid to an employee are governed by the

law of the state in which the benefits were paid ….."  *Boyle v. Texasgulf Aviation, Inc.*, 696 F. Supp. 951, 953-54 (S.D.N.Y. 1988) (citing *Liberty Mutual Ins. Co. v. Borsari Tank Corp.*, 248 F.2d 277, 282 (2d Cir. 1957)), *aff'd*, 875 F.2d 307 (2d Cir. 1989); *see also In re Air Crash Near Clarence Center*, 882 F. Supp. 2d at 410 (when worker's compensation law is in conflict, New York applies law of state where workers' compensation benefits are paid, "because that state has the greater interest in having its law applied on that issue.") (citing *McDuffie v. Wilner*, 415 F. Supp. 2d 412, 420 (S.D.N.Y. 2006)).

Plaintiffs cite the recent decision of the Appellate Division, Third Department, in *Harris v. Ballard*, 953 N.Y.S.2d 366 (App.Div. 3d Dep't Nov. 1, 2012), to illustrate the application of this rule under circumstances very similar to those presented in this action. In *Harris*, the plaintiff was a New Brunswick domiciliary who was driving a tractor-trailer in New York State when he collided with a vehicle driven by the defendant, a New York domiciliary.  The plaintiff sought and received workers' compensation benefits from the Workplace Health, Safety, and Compensation Commission of New Brunswick, Canada (the "WHSCC"), pursuant to the New Brunswick Workers' Compensation Act.  In exchange for payment of benefits, the plaintiff assigned his personal injury claim to the WHSCC, which in turn commenced a subrogation action in New York against the alleged tortfeasor seeking reimbursement of the amounts paid to the plaintiff.  The defendant moved to dismiss the action, arguing (as plaintiffs do here) that New York law does not recognize the right of a plaintiff to assign a personal injury claim to a workers' compensation carrier, or the right of the carrier to seek reimbursement through subrogation.

The court rejected that argument, holding as follows:

> The laws in conflict here do not concern true loss allocation, but deal only with the insurer's right of reimbursement. In contrast to the interest analysis applied to resolve conflicts of loss allocation rules, the rights of an employer or insurer to the reimbursement of workers' compensation benefits paid to an employee are governed by the law of the forum in which the benefits were paid. Here, plaintiff filed for and accepted benefits under the New Brunswick Workers' Compensation Act. Accordingly, the law of New Brunswick governs WHSCC's right of reimbursement.

*Harris v. Ballard*, 953 N.Y.S.2d 366, 367 (App. Div. 3d Dep't Nov. 1, 2012) (citing *Boyle*, 696 F. Supp. at 953-54; *Carminucci v. Pepsico, Inc.*, 653 N.Y.S.2d 946 (App. Div. 2d Dep't 1997) ("The rights of an employer to be reimbursed for workers' compensation benefits paid to an employee are governed by the law of the State in which the benefits were paid."); *Canfield v. Child World*, 619 N.Y.S.2d 95 (App. Div. 2d Dep't 1994) (same)).

Notwithstanding this relatively clear pronouncement by both the state and federal courts regarding New York's choice of law with respect to conflicts involving the workers' compensation statutes of different jurisdictions, defendants argue that the simplistic approach espoused in *Harris* ignores the interest analysis required by the holdings of the New York Court of Appeals in *Babcock*, *Neumeier*, and *Schultz*. A similar argument was addressed by the district court for the Northern District of New York in *Woodall v. Rich Albany Hotel, LLC*, 2012 WL 1204018 (N.D.N.Y. Apr. 11, 2012), decided just prior to the Appellate Division's ruling in *Harris*.

In *Woodall*, the plaintiff was an airline pilot who commenced a diversity negligence action in the Northern District against the owner of a hotel located near the airport in Albany, New York, seeking damages for injuries she allegedly suffered when she slipped and fell on ice outside the hotel. The plaintiff's employer moved to intervene in the action in order to protect its right to a statutory lien on workers' compensation benefits paid to the

plaintiff under Georgia law.  In assessing whether the employer had a protectible interest in the litigation, the court undertook a choice of law analysis to determine whether the substantive law of New York or Georgia governed on the issue of preserving a workers' compensation lien.  Focusing on the Second Department's decision in *Carminucci v. Pepsico*, the Northern District rejected the argument that a subrogee's claim for reimbursement of worker's compensation benefits presents a loss allocation issue requiring the court to engage in a complete "interest analysis" under *Babcock*, *Neumeier*, and *Schultz*.  According to the district court:

> To argue that the *Carminucci* Court, after having the rich benefit of the *Babcock*, *Neumeier*, and *Schultz* precedents, actually ignored them and did not apply the appropriate choice of law analysis created by them, may be myopic.  As we all should know, in New York, appellate courts are required, much like lawyers, trial judges, and the public, to follow the law as announced by the New York Court of Appeals, the highest Court in the State.  Even though the *Carminucci*[ ] decision may be devoid of a multi-paged analysis and it may have delivered a crisp pronouncement of the relevant law, such a decisive decision should not necessarily suggest that the court did not perform an interest analysis, determining the jurisdiction with the greatest interest which relates to the purpose of the particular law in conflict, that is here workers' compensation lien statutes, or a grouping of contacts analysis to establish which State law had the most significant relationship to the transaction (here the enforcement of a lien) and the parties.  What should not be forgotten about *Neumeier* is that it formulated a few rules of general applicability which would promise a fair level of predictability and uniformity.  *Carminucci* likewise, in the scheme of things, presents a predictable and uniform rule as to which jurisdiction would have the most predominant and relative interests in having its law govern the preservation and prosecution of a workers' compensation lien.  This Court recognizes that the New York Court of Appeals has not spoken on the choice of law rules relevant to workers' compensation lien provisions, but, when one of the State's four appellate courts has rendered such a ruling, which has not been contradicted or distinguished by another New York appellate court, it is generally deemed to be a controlling precedent in New York.

*Woodall*, 2012 WL 1204018, at *5.

Now armed with the subsequent pronouncement of the Third Department in *Harris*,

and adopting the reasoning of the Northern District in *Woodall*, this court adheres to the

clear weight of federal and state decisional authority cited above establishing that, under

New York's choice of law rules, the right of a workers' compensation insurance carrier to

bring a third-party subrogation action against a potential tortfeasor for reimbursement of

amounts paid to an injured worker or survivor as workers' compensation benefits is

governed by the substantive law of the forum in which the benefits were paid.  The court

therefore finds that, having paid benefits to Ms. Geris and her family under the WSIA, and

having been properly assigned the right to seek reimbursement of the amounts paid

through subrogation, the WSIB has standing to pursue the claims asserted against

defendants in this diversity action, as recognized under the substantive law of Ontario.

Accordingly defendants are not entitled to summary judgment on the ground that

New York's choice of law rules require dismissal of the WSIB's subrogation claim.

### B.     Champerty

Defendants also contend that Ms. Geris's assignment of her wrongful death claim

to WSIB is invalid under New York's "champerty" statutes, citing General Obligations Law

§ 13-101(1), and Judiciary Law § 489.  General Obligations Law § 13-101(1) provides,

simply, that "[a]ny claim or demand can be transferred, except … [w]here it is to recover

damages for personal injury …."   Judiciary Law § 489 provides, in relevant part:

> No person or co-partnership, engaged directly or indirectly in the business
> of collection and adjustment of claims, and no corporation or association,
> directly or indirectly, itself or by or through its officers, agents or employees,
> shall solicit, buy or take an assignment of, or be in any manner interested in
> buying or taking an assignment of a bond, promissory note, bill of exchange,

book debt, or other thing in action, or any claim or demand, with the intent
and for the purpose of bringing an action or proceeding thereon ….

N.Y. Judiciary Law § 489(1).

As explained by the New York Court of Appeals, Judiciary Law § 489 represents
New York's current codification of the champerty doctrine, which was "developed hundreds
of years ago to prevent or curtail the commercialization of or trading in litigation." *Bluebird
Partners, L.P. v. First Fid. Bank, N.A.*, 94 N.Y.2d 726, 729 (2000).  The champerty doctrine
grew out of the feudal "champart" system for acquiring partial tenancy interests in land,
eventually encompassing the practice by "champertors [who were] nearly always lawyers"
of purchasing interests in land claims under litigation at a price far below the value of the
land itself, in order to avoid the strict prohibitions of usury laws.  *Id.* at 733-34.

"The doctrine of champerty developed to prevent or curtail the commercialization
of or trading in litigation …," and its application in New York "has always been limited in
scope and largely directed toward preventing attorneys from filing suit merely as a vehicle
for obtaining costs." *Trust for the Certificate Holders of Merrill Lynch Mortg. Investors, Inc.
v. Love Funding Corp.*, 13 N.Y.3d 190, 198-99 (2009) (internal quotation marks and citation
omitted); *see also Richbell Info. Servs., Inc. v. Jupiter Partners*, 723 N.Y.S.2d 134, 139
(App. Div. 1st Dep't 2001) ("The courts historically have interpreted the proscription of
§ 489 as a narrow one.").   Where, as here, the claim sued upon was acquired by
assignment, it may be barred by Judiciary Law § 489 as champertous only if it can be
shown that the foundational intent to sue on that claim was "at least … the primary purpose
for, if not the sole motivation behind, entering into the transaction" underlying the
assignment. *Bluebird Partners*, 94 N.Y.2d at 736 (2000).  "In short, the champerty statute

does not apply when the purpose of an assignment is the collection of a legitimate claim." *Love Funding Corp.*, 13 N.Y.3d at 201.

In this case, it is  undisputed that the claim sued upon by the WSIB was acquired through assignment by operation of Ontario law when Ms. Geris elected to claim survivors' benefits under the WSIA.  Significantly, under that statute's subrogation provisions, the WSIB's interest in this claim is limited to the recovery of the amount it has paid in workers' compensation benefits (plus recoupment of the costs of bringing the action), and any amounts beyond this reimbursement recovered from the defendants as damages in this action must be remitted to Ms. Geris and her children as "surplus."  *See* WSIA § 30(12). The clear purpose of these provisions is to allow the WSIB to pursue a legitimate claim against the tortfeasor for reimbursement of amounts paid as compensation to the survivors of a covered worker, and not "for the sole purpose of bringing a claim against [defendants] either as an investment or to harass or injure [them]."  *Promenade v. Schindler El. Corp.*, 834 N.Y.S.2d 97, 99 (App. Div. 1st Dep't 2007), *quoted in Love Funding Corp.*, 13 N.Y.3d at 200-01.

To address defendants' argument that the assignment of plaintiff's wrongful death claim to the WSIB is prohibited by General Obligations Law § 13-101(1), the court returns to *Harris v. Ballard*.  In that case, the defendant made an identical argument with respect to the plaintiff's assignment of his personal injury claim to the New Brunswick WHSCC. The Appellate Division soundly rejected this argument, holding that:

> Although that statute prohibits the transfer of claims to recover damages for personal injury, it does not apply to subrogation assignments such as the one embodied in [New York] Workers' Compensation Law § 29(2) … designed "to provide for reimbursement of the compensation carrier whenever a recovery is obtained in tort for the same injury that was a

predicate for the payment of compensation benefits." Because the applicable New Brunswick statute provides a similar right of subrogation (*see* Workers' Compensation Act, RSNB 1973, ch. W–13, part I, § 10[10]), General Obligations Law § 13–101(1) does not apply to bar this action.

*Harris*, 953 N.Y.S.2d at 367-68 (quoting *Matter of Hiser v. Richmor Aviation, Inc.*, 899 N.Y.S.2d 473, 475 (App. Div. 3d Dep't 2010); *see also Commissioners of State Ins. Fund v. Low*, 138 N.Y.S.2d 437, 439 (App. Div. 3d Dep't 1955) (Workers Comp. Law § 29 provides "special statutory authority for the assignment of a cause against a third party"); *Liberty Mut. Fire Ins. Co. v. Perricone*, 388 N.Y.S.2d 670 (App. Div. 2d Dep't 1976) (subrogation is not "transfer of a cause of action" prohibited by Gen. Oblig. Law § 13-101(1)). Based on this weight of authority, and in the absence of any citation to contrary holdings, the court finds that the subrogation assignment of plaintiff's wrongful death claim to the WSIB is not barred by § 13-101.

Accordingly, defendants are not entitled to summary judgment on the ground that Ms. Geris's assignment of her wrongful death claim to WSIB is invalid under New York's champerty statutes.

## C.    Limitation of Damages

Defendants also contend that, should WSIB be permitted to maintain this action, its recovery in subrogation is limited under New York law to damages in the amount it has paid to the injured party as workers' compensation benefits. This contention is likewise rejected.

As already noted above, upon Ms. Geris' election to claim survivor benefits under the WSIA, her claims against defendants were assigned to the WSIB by operation of Ontario law, which defines the WSIB's rights of recovery in subrogation. Under the WSIA,

the WSIB "is subrogated to the rights of the … survivor in respect of the action [and} … is solely entitled to determine whether or not to commence, continue or abandon the action and whether to settle it and on what terms." WSIA § 30(10).   If the WSIB sues the tortfeasor and ultimately "receives an amount of money greater than the amount expended in pursuing the action and providing the benefits under the insurance plan to the … survivor, the [WSIB] … shall pay the surplus to the … survivor …," *id.* at § 30(12), and "[f]uture payments to the … survivor under the insurance plan shall be reduced to the extent of the surplus paid to him or her." *Id.* at § 30(13).   There is nothing in this statutory language that can be construed as a limitation on the amount the WSIB might be able to recover as damages in its subrogation claim against the tortfeasor.

In support of their argument that WSIB's recovery is limited to reimbursement, defendants cite *Winkelmann v. Excelsior Ins. Co.*, 85 N.Y.2d 577 (1995), in which the New York Court of Appeals explained that the purpose of subrogation is to place an insurer, which has paid for losses suffered by its insured, "in the position of its insured so that it may recover from the third party legally responsible for the loss." *Id.* at 581.   The primary objective of the subrogation principle is to prevent the insured from obtaining a double recovery, without limiting the insured's right of action against the tortfeasor for uninsured losses.   According to the Court of Appeals in *Winkelmann*:

> [S]ubrogation rights accrue upon payment of the loss.   At that point, an insurer who has paid the policy limits possesses the derivative and limited rights of the insured and may proceed directly against the negligent third party to recoup the amount paid.   This is so even though the insured's losses are not fully covered by the proceeds of the policy.   The claims of the insurer for amounts paid by it and the insured's claim for uninsured losses are divisible and independent, and permitting the insurer to sue as equitable subrogee does not affect the insured's right to sue for the amount of the loss remaining unreimbursed.

*Id.* at 582 (internal quotation marks, alterations, and citations omitted).

As this language suggests, there is no inconsistency between an insurer's  right of recovery in subrogation under New York law and the subrogation rights of the WSIB as defined by the Ontario workers' compensation statute.  In short, the subrogation doctrine does not allow the payment of insurance policy proceeds (or, in this case, the payment of workers' compensation benefits ) to relieve the tortfeasor for liability to the insured (or injured worker) for damages beyond the amount of the payment.  Rather, as explained in *Winkelmann*, the doctrine accommodates both the insurer's right to recover its payment and the insured's right to be made whole for damages caused by the tortfeasor's negligence.[1]

Significantly, as already noted above, any amount recovered in this action as damages in excess of the WSIB's payments to Ms. Geris (plus incurred costs) must be remitted to the Geris family as "surplus" under WSIA § 30(12).  Accordingly, there is no risk of a windfall to the WSIB, and no risk of a double recovery, since the Geris family will recover only the amount determined by application of New York tort law to be the actual damages suffered.

Accordingly, defendants are not entitled to summary judgment dismissing plaintiffs' claim for damages beyond "the amount expended in pursuing the action and providing the benefits under the insurance plan ...."  WSIA § 30(12).

---

[1]This holding also disposes of the defendants' argument that recognition of the plaintiffs' rights under the WSIA to recover damages beyond reimbursement offends principles of international comity. *See, e.g., Pravin Banker Associates, Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997) (federal court will recognize legislative, executive or judicial acts of another nation unless "doing so would be contrary to the policies or prejudicial to the interests of the United States.").

D.      **Loss of Consortium**

In the amended complaint, plaintiffs claim in their fifth and sixth causes of action for compensatory damages that, as a result of defendants' negligence, "Lorna Geris and her children were deprived of the love, society, companionship, advice, care, guidance and support of Mr. Geris."  Item 54, ¶¶ 42, 46.  According to defendants, this claim must be dismissed because New York law (which, the parties agree, governs the determination of damages recoverable in this wrongful death action) does not recognize a claim for this type of non-pecuniary injury, commonly referred to as "loss of consortium."

In New York, a cause of action for wrongful death is defined by the Estates, Powers & Trusts Law (commonly referred to as the  "EPTL"), which allows the decedent's personal representative to "recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued."  EPTL § 5–4.1(1).   The statute permits recovery of "fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought …,"  EPTL § 5-4.3(a), including an award of "punitive damages … if such damages would have been recoverable had the decedent survived."  EPTL § 5-4.3(b).

In *Liff v. Schildkrout*, 49 N.Y.2d 622 (1980), the New York Court of Appeals clarified that,  since the enactment of New York's first wrongful death statute in 1847, the phrase "pecuniary injuries" has been consistently construed by New York courts "as excluding recovery for grief, and loss of society, affection and conjugal fellowship all elements of the generic phrase 'loss of consortium.' "  *Id.* at 633 (citing cases).  Although the number of states that share this view "appears to be shrinking …," *Goldberg v. UBS AG*, 690 F. Supp.

2d 92, 97 n. 10 (E.D.N.Y. 2010) (citing 22A AM. JUR. 2d Death § 223 (2009); other citations omitted), *Liff v. Schildkrout*'s interpretation of EPTL § 5-4.3(a) remains the law in New York.

By the same token, New York courts have also recognized that the loss of the benefits of a parent's nurture and care; physical, moral and intellectual training; performance of household duties; and providing of love, guidance and advice may be considered within the calculation of "pecuniary injuries" compensable in a wrongful death action under the EPTL. *See, e.g., Leger v. Chasky*, 865 N.Y.S.2d 616, 618 (App. Div. 2d Dep't 2008) ("The loss of parental nurture and care, as well as physical, moral, and intellectual training, is a proper component of pecuniary injury and may be considered by the jury in determining damages."); *Pullman v. Pullman*, 629 N.Y.S.2d 577, 578 (App. Div. 4th Dep't 1995) (evidence that decedent cooked, cleaned and ironed for her adult children and babysat grandchildren was evidence of pecuniary loss); *Korman v. Public Service Truck Renting, Inc.*, 497 N.Y.S.2d 480, 481 (App. Div. 2d Dep't 1986) (evidence of decedent's performance of household duties, and providing of love, guidance and advice is sufficient proof of pecuniary loss under the wrongful death statute). As stated by the Appellate Division in *Franchell v. Sims*, 424 N.Y.S.2d 959 (App. Div. 4th Dep't 1980):

> The assessment of damages in a wrongful death case is peculiarly within the province of the jury whose determination should not be disturbed unless it is so excessive or inadequate that it shocks the conscience of the court. Since there is little probability that the facts in any two wrongful death cases will be alike, and, in arriving at a proper award, an infinite variety of human characteristics and family situations affect the numerous factors which must be examined, each case must be viewed on its own merits with respect to the damages recoverable.

*Id.* at 962.

Based on this statutory and case law authority, the court finds that the fifth and sixth causes of action in plaintiffs' amended complaint properly set forth claims within the calculation of "pecuniary injuries" suffered by Ms. Geris and her children as a result of the loss of Mr. Geris's "advice, care, guidance and support."  The court also finds that those causes of action must be dismissed to the extent they seek damages based on non-pecuniary injuries resulting from the loss of Mr. Geris's "love, society, [and] companionship," notwithstanding that such circumstances might be considered proper areas of inquiry in the factfinder's examination of factors pertinent to the assessment of damages for wrongful death.

### E.    Waiver

Defendants also seek dismissal of Ms. Geris's claims on the ground that her election to receive WSIA benefits on behalf of herself and her three children resulted in an absolute waiver of their rights to bring a third-party action against any potential tortfeasor.  "The affirmative defense of waiver involves a wide variety of possible applications, but generally involves the voluntary and intentional relinquishment of a known right."  *Herman v. National Enterprise Systems, Inc.*, 2008 WL 4186321, at *5 (W.D.N.Y. Sept. 10, 2008) (citing *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 585 (2d Cir. 2006); *see also Gilbert Frank Corp. v. Fed. Ins. Co.*, 70 N.Y.2d 966, 968 (1988) ("Waiver is an intentional relinquishment of a known right and should not be lightly presumed.").

As set forth above, the "Election Form" signed by Ms. Geris contained language stating that her choice to receive benefits under the WSIB plan was made with the

understanding "that the Workplace Safety and Insurance Board may bring a legal action …

[and] that [Ms. Geris] cannot bring a legal action against anybody on [her] own."  Item 67-

12, p. 2.   This statement contains no language to suggest that, by accepting survivor

benefits under the WSIA, Ms. Geris intentionally relinquished her right to join the WSIB's

subrogation action in order to assert a claim under WSIA § 30(12), either on her own

behalf or on behalf of her children, for recovery of any "surplus" beyond the amount

expended by the WSIB in providing benefits under the insurance plan.

Accordingly, defendants are not entitled to summary judgment on the ground of

waiver.

## F.    Punitive Damages

Defendants also seek dismissal of plaintiffs' claim for punitive damages.   The

threshold for establishing punitive damages in New York is "demanding," requiring the

plaintiff to demonstrate that the defendant's conduct was "so reckless or wantonly negligent

as to be the equivalent of a conscious disregard of the rights of others and that the conduct

demonstrates a high degree of moral culpability."   *West v. Goodyear Tire & Rubber Co.*,

973 F. Supp. 385, 387 (S.D.N.Y. 1997) (quoting *Rinaldo v. Mashayekhi*, 585 N.Y.S.2d 615

(App. Div. 3d Dept. 1992)); *see also Danis v. CSX Transportation, Inc.*, 2005 WL 2133604,

at *2 (W.D.N.Y. Aug. 31. 2005).   The purpose of a punitive damages award is "not to

compensate the injured party but rather to punish the tortfeasor and to deter this

wrongdoer and others similarly situated from indulging in the same conduct in the future."

*Ross v. Louise Wise Services, Inc.*, 8 N.Y.3d 478, 489 (2007) (citing *Walker v. Sheldon*,

10 N.Y. 2d 401, 404 (1961)).

As summarized in *West v. Goodyear*:

> New York courts have used a variety of phrases to describe the "moral culpability" that will support punitive damages for nonintentional torts including: "utter recklessness;" "reckless and of a criminal nature, and clearly established;" "wanton or malicious, or gross and outrageous" or "a design to oppress and injure;" "conscious indifference to the effect of his acts;" action "committed recklessly or wantonly, *i.e.*, without regard to the rights of the plaintiff, or of people in general." In summary, … the recklessness that will give rise to punitive damages must be close to criminality and like criminal behavior, it must be clearly established. … [E]ven where there is gross negligence, punitive damages are awarded in singularly rare cases such as cases involving an improper state of mind or malice or cases involving wrongdoing to the public.

973 F. Supp. at 387 (internal quotation marks, alterations and citations omitted).   "[A] plaintiff seeking punitive damages in New York must prove the existence of these factors by a preponderance of the evidence."  *Marcoux v. Farm Service and Supplies, Inc.*, 283 F. Supp. 2d 901, 908 (S.D.N.Y. 2003) (citing *Greenbaum v. Svenska Handelsbanken, NY*, 979 F. Supp. 973, 982-83 (S.D.N.Y. 1997).  "[T]he determination whether to award punitive damages and in what amount those damages should be awarded generally rests within the sound discretion of the trier of fact …."  *In re Eighth Judicial Dist. Asbestos Litigation*, 938 N.Y.S.2d 715, 716 (App. Div. 4th Dep't 2012).

In this case, plaintiffs have proffered evidence of conduct attributable to DTE giving rise to genuine issues of fact sufficient to require submission of the question of punitive damages to a jury.  By way of example, Mr. Marte testified at his deposition that he had no prior truck driving experience when he was hired by DTE in January 2006–less than a month after he obtained his CDL, and less than a month before the accident involving Mr. Geris.  *See* Item 73-1, pp. 29-30, 73.   He also testified that his training with DTE involved watching a one hour video and taking a DTE-conducted road test that did not involve

highway driving.  *See id.* at 65-67.  Mr. Marte did not receive any training from DTE about where to park the tractor-trailer when he stopped to rest or sleep.  *See id.* at 120-121.

In addition, according to the deposition testimony of Melissa Eugenio-Gibson, DTE's Safety Director at the time of the accident, DTE was experiencing a significant increase in business during that period, and was hiring new drivers on a regular basis Ms. Eugenio-Gibson testified that DTE would essentially hire driver with a CDL who passed the company's road test, and would allow them to drive tractor-trailers on long distance routes without any safety training.  *See* Item 74-2, pp. 33-36.  Although she held the title of Safety Director, Ms. Eugenio-Gibson had no experience in safety training, had never taken a course in safety training, and was not allowed to participate on DTE's Safety Committee.  *Id.* at 29, 31, 42, 56-57.  She also testified that DTE's driver handbook did not address safety issues, and to her knowledge the handbook was not actively utilized by DTE drivers.  *Id.* at 60-62.  According to Ms. Eugenio-Gibson, when she tried to address her concerns about the inadequacy of safety training at DTE with management, she was told by Christopher DiSilva to "[m]ind [her] own business."  *Id.* at 52-53.

Considering just this evidence in the light most favorable to plaintiffs, the court must reject defendant's contention that there is no valid line of reasoning or permissible inferences to be drawn from the available proof upon which a rational jury might conclude that DTE acted with "wanton and reckless" disregard for public safety by failing to adopt or enforce a tractor-trailer driver training and safety program, or to assure that the drivers it hired actually had the ability, training, and experience necessary for safe operation of tractor-trailers on heavily traveled interstate highways.  *Sweeney v McCormick*, 552 N.Y.S.2d 707, 709 (App. Div. 3d Dep't 1990) (act is considered "wanton and reckless"

-28-

when done under circumstances showing "heedlessness and an utter disregard for the rights and safety of others."). Accordingly, defendants are not entitled to summary judgment dismissing plaintiffs' punitive damages claim from the case.

## III.   Plaintiffs' Motion

Plaintiffs contend that Mr. Marte's admission that he failed to yield the right of way when he re-entered the driving lane of the Thruway 90 and collided with Mr. Geris's vehicle, as evidenced by his plea of guilty to the charge of violating N.Y. Vehicle & Traffic Law § 1143, provides uncontroverted, dispositive proof of defendants' negligence as a matter of law, warranting entry of partial summary judgment in favor of plaintiffs on the issue of liability.

New York courts have consistently held that proof of a driver's failure to yield the right of way in violation of Vehicle and Traffic Law § 1143 is sufficient to establish the driver's negligence as a matter of law.   *See, e.g., Garza v. Taravella*, 905 N.Y.S.2d 392, 394 (App. Div. 4th  Dep't 2010) (affirming grant of partial summary judgment on liability; proof established that defendant violated § 1143 and "was negligent as a matter of law in failing to see that which [he] should have seen…," and defendant failed to raise a triable issue of fact in opposition); *Ferrara v. Castro*,724 N.Y.S.2d 81 (App. Div. 2d Dep't 2001) (granting plaintiff's motion for summary judgment on liability; "By entering traffic without yielding as required by law, the defendant driver was negligent as a matter of law in colliding with the plaintiff's automobile, and his negligence was a proximate cause of the accident."); *Frushone v. Juliano*, 287 N.Y.S.2d 628, 629 (App. Div. 4th Dep't 1968) (failure

of defendant to yield the right of way to plaintiff "was a plain violation of section 1143 …
and the proximate cause of the accident.").

However, even where the uncontroverted evidence establishes the defendant's
liability for negligence as a matter of law, the courts have been reluctant to grant the
plaintiff summary judgment on liability where the record reveals questions of fact
demonstrating some measure of comparative fault on the part of the plaintiff.  *See, e.g.,
Mejia v. Manzur*, 2011 WL 4916698, at *3 (E.D.N.Y. Oct. 14, 2011) (finding triable issues
of material fact as to comparative negligence where circumstances demonstrated that the
driver on the roadway failed to take any action to avoid an impending accident with a driver
carefully exiting from a parking space); *Thomas v. O'Brien*, 2010 WL 785999, at *4
(E.D.N.Y. Feb. 26, 2010) ("[E]ven if a party presents uncontroverted evidence that he had
the right-of-way … , summary judgment is not warranted where the record creates
questions of fact demonstrating that driver's comparative negligence.").

To raise genuine issues of fact with regard to Mr. Geris's comparative fault in this
case, defendants primarily rely on the reports of their two "accident reconstructionists"
retained to provide expert opinion testimony at trial.  For example, in his expert report and
accompanying affidavit, Cheyenne "Shawn" Saunders, P.E., states that, based on his
review of available materials and his observation of the conditions in the area at the time
of the accident, it was his opinion that a "normal, prudent driver" would have had a clear
and unobstructed view of the road as he approached the accident site, and would have
had ample opportunity to perceive a large, slow moving tractor-trailer entering the roadway
in time to avoid collision.  Item 79, Exh. B (Saunders Aff.), ¶¶ 4-9; *see also id.* (Saunders
Report), pp. 6-16.

Similarly, Jeffrey L. Wirth, PE, states in his expert affidavit that, based upon his "crash reconstruction and impact analysis," it was his opinion within "a reasonable degree of engineering and accident reconstruction certainty" that Mr. Geris "initiated action too late to avoid the impact.  It is likely that Mr. Geris had enough time and distance to perceive and react to avoid the collision by braking and maneuvering."  Item 79, Exh. C (Wirth Aff.), ¶¶ 1, 7, 13.  According to Mr. Wirth, "Mr. Geris contributed to the accident by failing to take appropriate evasive action, despite having the time and distance to do so."  *Id.* at ¶ 14.

In addition, defendants make reference to the deposition testimony of plaintiffs' retained accident reconstruction expert, Ali Sadegh, PhD, who testified that the road and weather conditions at the time indicated to him that Mr. Geris would have had an unobstructed view of the area where the accident happened, and there was no physical evidence to suggest that Mr. Geris took evasive action despite the opportunity to do so. *See* Item 79-1 (Sadegh Dep.), pp. 30-32, 35-55.

Viewing this proffer in the light most favorable to the non-moving party, and drawing all rational inferences in that party's favor, the court finds that reasonable jurors could disagree as to the probative value of the opinions of defendants' accident reconstruction experts with regard to the issue of Mr. Geris's comparative negligence.  Although the proof regarding Mr. Marte's conduct, including his conviction for violation of the state's Vehicle and Traffic Law, provides a persuasive basis for finding defendants liable for negligence as a matter of law, plaintiffs have not met their burden to demonstrate the absence of triable issues of fact with regard to whether Mr. Geris should bear some measure of responsibility for causing the accident, preventing the entry of summary judgment in favor of plaintiffs–even in part.

Accordingly, upon consideration of the record presented by way of the parties' submissions in light of the pertinent statutory and case law authority, the court must deny both the defendants' motion and the plaintiffs' cross-motion for partial summary judgment.

## **CONCLUSION**

Based on the foregoing, defendants' motion for summary judgment (Item 67) and plaintiffs' cross-motion for partial summary judgment (Item 72) are both denied.

A telephone conference with counsel is scheduled for September 11, 2013, at 2:15 p.m., to discuss a schedule for further proceedings in the case.  The court will initiate the call.

SO ORDERED.

_____
JOHN T. CURTIN
United States District Judge

Dated:                            , 2013
p:\pending\2007\07-376.SJ.july19. 2013